UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

Eastern District of Kentucky
F I L E D

JUN 1 5 2005

AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 04-341-GWU

HERBERT D. WOODS,                                            PLAINTIFF,

VS.                          **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,                             DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative

denial of his applications for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI). The appeal is currently before the Court on cross-motions

for summary judgment.

## APPLICABLE LAW

The Sixth Circuit Court of Appeals has set out the steps applicable to judicial

review of Social Security disability benefit cases:

1.  Is the claimant currently engaged in substantial gainful activity?
    If yes, the claimant is not disabled. If no, proceed to Step 2.
    See 20 CFR 404.1520(b), 416.920(b).

2.  Does the claimant have any medically determinable physical
    or mental impairment(s)? If yes, proceed to Step 3. If no, the
    claimant is not disabled. See 20 CFR 404.1508, 416.908.

3.  Does the claimant have any severe impairment(s)--i.e., any
    impairment(s) significantly limiting the claimant's physical or
    mental ability to do basic work activities? If yes, proceed to

1

Woods

Step 4. If no, the claimant is not disabled. <u>See</u> 20 CFR 404.1520(c), 404.1521, 416.920(c), 461.921.

4. Can the claimant's severe impairment(s) be expected to result in death or last for a continuous period of at least 12 months? If yes, proceed to Step 5. If no, the claimant is not disabled. <u>See</u> 20 CFR 404.920(d), 416.920(d).

5. Does the claimant have any impairment or combination of impairments meeting or equaling in severity an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (Listing of Impairments)? If yes, the claimant is disabled. If no, proceed to Step 6. <u>See</u> 20 CFR 404.1520(d), 404.1526(a), 416.920(d), 416.926(a).

6. Can the claimant, despite his impairment(s), considering his residual functional capacity and the physical and mental demands of the work he has done in the past, still perform this kind of past relevant work? If yes, the claimant was not disabled. If no, proceed to Step 7. <u>See</u> 20 CFR 404.1520(e), 416.920(e).

7. Can the claimant, despite his impairment(s), considering his residual functional capacity, age, education, and past work experience, do other work—i.e., any other substantial gainful activity which exists in the national economy? If yes, the claimant is not disabled. <u>See</u> 20 CFR 404.1505(a), 404.1520(f)(1), 416.905(a), 416.920(f)(1).

<u>Garner v. Heckler</u>, 745 F.2d 383, 387 (6th Cir. 1984).

Applying this analysis, it must be remembered that the principles pertinent to the judicial review of administrative agency action apply. Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. <u>Jones v. Secretary of Health and Human Services</u>, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial

2

evidence" is "more than a mere scintilla[; i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . ." Wright v. Massanari, 321 F.3d 611, 614 (6th Cir. 2003) (quoting Kirk v. Secretary of Health and Human Services, 667 F.2d 524, 535 (6th Cir. 1981). It is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the detracting factors in the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these

3

Woods

symptoms.  20 CFR Section 404.1529 (1991).  However, in evaluating a claimant's

allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an
> underlying medical condition.  If there is, we then examine:  (1)
> whether objective medical evidence confirms the severity of the alleged
> pain arising from the condition; or (2) whether the objectively
> established medical condition is of such a severity that it can
> reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir.

1986).

Another issue concerns the effect of proof that an impairment may be

remedied by treatment.  The Sixth Circuit has held that such an impairment will not

serve as a basis for the ultimate finding of disability.  Harris v. Secretary of Health

and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984).  However, the same

result does not follow if the record is devoid of any evidence that the plaintiff would

have regained his residual capacity for work if he had followed his doctor's

instructions to do something or if the instructions were merely recommendations.

Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106,

1113 (6th Cir. 1986).

In reviewing the record, the Court must work with the medical evidence before

it, despite the plaintiff's claims that he was unable to afford extensive medical work-

ups.  Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir.

1987).  Further, a failure to seek treatment for a period of time may be a factor to be

4

Woods

considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step six refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 CFR 416.965(a) and 20 CFR 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 CFR Part 404, Subpart P, Appendix 2 and

5

analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 CFR 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 CFR 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 CFR Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term

6

Woods

"framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Herbert D. Woods, filed his initial applications for DIB and SSI on January 22, 1996, alleging disability due to a nervous breakdown after a motor vehicle accident, as well as certain physical impairments such as high blood pressure. (Tr. 199-2001, 212, 552-6). After several administrative denials and appeals, and a remand under Sentence Four of 42 U.S.C. §405(g) by United States Magistrate Judge J. Gregory Wehrman in 2002 (Tr. 601-3), the Commissioner issued her final administrative decision on these applications on May 22, 2003 (Tr. 586-93). The plaintiff had also filed subsequent DIB and SSI applications on February 29, 2000, and the SSI application was allowed at the initial level with an

onset date of February 18, 2000. (Tr. 586).[1] In the final, 2003 decision, an

Administrative Law Judge (ALJ) found that the relevant period for consideration was

January 2, 1996 to February 18, 2000. (Id.). The ALJ determined that during this

period, the plaintiff had "severe" impairments consisting of hypertension,

degenerative disc disease of the lumbar spine, chronic obstructive pulmonary

disease secondary to nicotine abuse, borderline intellectual functioning, a history of

alcohol and other substance abuse, chest pain of uncertain etiology,

gastroesophageal reflux disease, a panic disorder with agoraphobia, depression,

and degenerative arthritis. (Tr. 30, 587). Nevertheless, based in part on the

testimony of a vocational expert (VE) and a medical expert (ME), the ALJ determined

that Mr. Woods had retained the residual functional capacity to perform a significant

number of jobs existing in the economy and, therefore, was not entitled to benefits.

(Tr. 590-3). The Appeals Council declined to review, and this action followed.

Specifically, the ALJ in the 2003 decision followed the functional capacity

finding of the prior ALJ, who had issued a denial decision on February 17, 2000.

This ALJ had determined that Mr. Woods retained the residual functional capacity

to perform a light level exertion, with no standing, sitting, or walking more than one

hour without interruption, and sit/stand option at his convenience, and also had the

---

[1]The plaintiff's Date Last Insured was March 31, 1999 (Tr. 626), meaning that he had to establish disability prior to this date in order to be eligible for DIB. His SSI application is not affected.

Woods

following non-exertional impairments.   (Tr. 39, 591).   He: (1) could not climb, balance, or operate foot controls; (2) could perform occasional, non-repetitive twisting, stooping, kneeling, crouching, and crawling; (3) needed to avoid temperature extremes, dust, fumes, gases, and excess humidity in the workplace; and (4) required low stress, entry-level work following simple, 1-2 step procedures with no frequent changes in work routines and limited interaction with the general public, co-workers, and supervisors. (Id.). When presented with a hypothetical question containing these factors, the VE responded that there were jobs that such a person could perform, and proceeded to give the numbers in which they existed in the state and national economies. (Tr. 160-1).

On appeal, this Court must determine whether the administrative decision is supported by substantial evidence.

Since much of the ALJ's discussion of the evidence for the relevant period was incorporated by reference from the February, 2000 decision, the two decisions will be discussed as one.

One of the problems with the ALJ's discussion of the evidence was his dismissal of mental restrictions contained in a July, 1998 medical report from the plaintiff's treating physician, Dr. Roy Varghese. This report was also signed by, and possibly filled out by Lenora Campbell, a registered nurse practitioner in Dr. Varghese's office who also performed some examinations of the plaintiff. (E.g., Tr.

9

Woods

466-7). In addition to giving functional physical restrictions, the medical report indicates that the plaintiff would have "poor or no" ability to deal with work stresses, function independently, or maintain attention and concentration, and would have a "seriously limited but not precluded" ability to follow work rules, relate to co-workers, deal with the public, use judgment, and interact with supervisors. (Tr. 471). This report was dismissed by the ALJ because opinions of a "nurse practitioner" are not entitled to controlling weight under the Social Security regulations. (Tr. 34). See 20 C.F.R Sections 404.1513(d); 416.913(d) (2004). However, it is very clear that Dr. Varghese also signed the report. (Tr. 471). Dr. Varghese had treated the plaintiff for his complaints of anxiety (Tr. 411) and referred him to various specialists to have his problems worked up (Tr. 412-14). He also referred the plaintiff in 1999 to Dr. G. S. Duckworth, a medical doctor and a psychologist (Tr. 484), who concluded that the patient was "totally disabled by both his psychiatric and his physical injuries." (Tr. 486). As a treating physician with access to reports from other specialists, the opinion of Dr. Varghese is entitled to great weight. Since the 1998 opinion was never recognized as being from the physician, as opposed to a registered nurse practitioner, this analysis was not made. It is also noteworthy that the ME who testified at the May 12, 2003 administrative hearing did not discuss this issue, either. (Tr. 814-21).

10

Woods

Other evidence from the relevant period includes a psychological evaluation by Mr. James Leisenring in July, 1999, on which the plaintiff was found to be malingering on IQ and achievement testing. (Tr. 541-3). Nevertheless, Mr. Leisenring also diagnosed a dysthymic disorder and a possible learning disability, and concluded that due to the plaintiff's "seemingly legitimate significant mixed depression and anxiety" he would have a "seriously limited but not precluded" ability to relate predictably in social situations and a "poor" ability to behave in an emotionally stable manner. (Tr. 547-8). The ALJ noted these findings, and stated that he rejected the IQ scores obtained by Mr. Leisenring due to malingering, but did not discuss the psychologist's limitations given as a result of the "seemingly legitimate" depression and anxiety. (Tr. 32). The ME at the 2003 hearing also mentioned this report only in the context of invalid IQ scores. (Tr. 815-16).

Finally, Dr. George Chaney, another family practice physician who had treated the plaintiff on several occasions in 1993 after an accident in which he had been knocked down by a car at a flea market (Tr. 292-9), performed a consultative examination in February, 1996 at the request of the state agency (Tr. 317). He noted anxiety (Tr. 318) and completed a medical report stating that Mr. Woods had a "seriously limited that not precluded" ability to relate to co-workers, deal with the public, interact with supervisors, and deal with work stresses (Tr. 310).

11

Woods

The Court recognizes that there is other evidence from the relevant period which tends to suggest that the plaintiff was not limited, but a full and fair adjudication requires that the contrary evidence from treating and examining sources be discussed and dealt with.

At the most recent administrative hearing, the ME did discuss a report from a psychiatrist, Dr. Cecilia Carpio-Carigaba of Corbin Psychiatric and Counseling Services, who began treating Mr. Woods on February 24, 2000, just days after the relevant period. (Tr. 817). Dr. Carpio noted that the plaintiff had developed nerve problems after being hit by a car that went through a building at a flea market he was attending in 1993. He had been treated by Kentucky River Community Care for three to four years and been tried on multiple anti-depressants for his symptoms of panic attacks and sleep difficulty. (Tr. 569). His panic attacks felt like heart attacks and he often had to visit the emergency room because he was incapacitated by them and unable to walk. Dr. Carpio diagnosed post traumatic stress disorder and panic attacks with agoraphobia, with a Global Assessment of Functioning (GAF) score of 40 to 50. (Id.)

The ME, surprisingly, testified that he did not understand where the diagnosis of PTSD had come from, as he saw no traumatic event that could have triggered anxiety and depression (Tr. 821). Not only Dr. Carpio's office note, but the entire record is replete with the plaintiff's claim that his nervousness was triggered by being

12

Woods

hit by a motor vehicle while inside a building at a flea market. This tends to cast some doubt on the reliability of the ME's testimony as a whole. On questioning by counsel for the plaintiff, the ME stated that the GAF score of 40 to 50 given by Dr. Carpio was based on Mr. Woods' subjective complaints, and he did not believe they represented actual restrictions. (Tr. 819). In December, 2002, Dr. Carpio submitted a Mental Medical Assessment form stating that Mr. Woods had a "seriously limited but not precluded" ability to deal with the public, to deal with work stresses, and to relate predictably in social situations. (Tr. 717-8). The consistency of this report with Dr. Carpio's initial GAF scores was not discussed by the ME, either, and the ALJ dismissed the 2002 assessment in his decision as "unsigned and unidentified" (Tr. 588) despite the fact that it is signed and dated by Dr. Carpio and that it was identified and discussed at the administrative hearing (Tr. 796-7). In any event, the ME essentially testified that Mr. Woods' condition did not meet a one of the Commissioner's Listings of Impairment, but he did not himself report specific functional restrictions.

The decision will be remanded for further consideration.

This the ___15___ day of June, 2005.

G. WIX UNTHANK
SENIOR JUDGE

13